WMN/VR
F#2009R00518, 2009R00710
NY-NYE-603

M-10-214

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

WADIE JAAFAR,
HUSSEN ALI CHAHINE,
   also known as "Hussein,"
~~████████████████████~~
YOUSSEF AYOUB,
AYMAN JAAFAR,
   also known as "Mohammad" and
   "Abu Jameel,"
HAIDAR AYOUB,
HASSAN ALI HAMDAN,
ALI ATA SALEH and
MAHDI TALEEB,

          Defendants.

- - - - - - - - - - - - - - - -X

FILED UNDER SEAL
C O M P L A I N T

(18 U.S.C. §§ 2320, 1956)

EASTERN DISTRICT OF NEW YORK, SS:

     JOSEPH HRONCICH, being duly sworn, deposes and states

that he is a Special Agent with the Drug Enforcement

Administration ("DEA"), duly appointed according to law and

acting as such.

     Upon information and belief, in or about and between

January 2009 and January 2010, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendants WADIE JAAFAR, HUSSEN ALI CHAHINE, also known as

"Hussein," ~~████████████████~~, YOUSSEF AYOUB, HAIDAR AYOUB,

AYMAN JAAFAR, also known as "Mohammad" and "Abu Jameel," HASSAN

ALI HAMDAN, ALI ATA SALEH and MAHDI TALEEB, together with others,

did knowingly and intentionally traffic in goods and knowingly

use a counterfeit mark on or in connection with such goods.

(Title 18, United States Code, Section 2320)

Upon information and belief, in or about and between

January 2009 and January 2010, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendants WADIE JAAFAR, YOUSSEF AYOUB, HASSAN ALI HAMDAN,

ALI ATA SALEH and MAHDI TALEEB, together with others, did

knowingly and intentionally conspire to: (i) conduct financial

transactions in and affecting interstate and foreign commerce,

which in fact involved the proceeds of specified unlawful

activity, to wit: counterfeit clothing trafficking, in violation

of Title 18, United States Code, Section 2320, knowing that the

property involved in the financial transactions represented the

proceeds of some form of unlawful activity with the intent to

promote the carrying on of specified unlawful activity, in

violation of Title 18, United States Code, Section

1956(a)(1)(A)(I); and (ii) engage in monetary transactions, in

and affecting interstate and foreign commerce, in criminally

derived property that was of a value greater than $10,000 and

that was derived from specified unlawful activity, to wit:

counterfeit clothing trafficking, in violation of Title 18,

United States Code, Section 2320, all in violation of Title 18,
United States Code, Section 1957.

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the
grounds for his belief are as follows:[1/]

1.    I have been a Special Agent with the DEA for
approximately five years.  During my tenure with the DEA, I have
participated in numerous money laundering and narcotics
investigations during the course of which I have (a) conducted
physical and wire surveillance; (b) executed search warrants at
locations where drugs, drug proceeds and records of narcotics and
money laundering transactions have been found; (c) reviewed and
analyzed numerous taped conversations and records of drug
traffickers and money launderers; (d) debriefed cooperating drug
traffickers and money launderers; (e) monitored wiretapped
conversations of drug traffickers and reviewed line sheets
prepared by wiretap monitors; and (f) conducted surveillance of
individuals engaged in drug trafficking and money laundering.
Prior to joining the DEA, I worked as a United States Customs and
Border Protection ("CBP") officer.  During my tenure with CBP, I
participated in several searches and seizures of counterfeit
merchandise.  I also interviewed importers and exporters of

---

[1/]    Because the purpose of this Complaint is to state only
probable cause to arrest, I have not described all the relevant
facts and circumstances of which I am aware.

garments.   Through my training, education and experience, I have become familiar with (a) the manner in which money is laundered and hidden; (b) the manner in which illegal drugs and contraband are imported and distributed; (c) the method of payment for such drugs; and (d) the efforts of persons involved in such activity to avoid detection by law enforcement.   Through my tenure with CBP and discussions with other agents, I have become familiar with the manner in which counterfeit merchandise trafficking operations are run and with related money laundering investigations.

I.   Background of the Investigation

2.   Since approximately 2006, the DEA and the Federal Bureau of Investigation ("FBI") have been investigating an organization involved in money laundering of proceeds from narcotics distribution and trafficking of counterfeit goods. Through the use of wiretaps, members of the organization were determined to be related by family ties and were operating bi-coastally within the United States, as well as internationally. In mid-2007, the investigation culminated in, among other things, the seizure of ten kilograms of cocaine in the New York area and the arrest and prosecution of multiple individuals in the Southern District of New York and the Central District of

California.[2/]  Those individuals eventually pled guilty to various charges, including money laundering, narcotics distribution, and trafficking of counterfeit clothing.

### A. The Identification of Co-Conspirator Younes El Saleh, Authorization of Wiretaps, and the Seizure of Counterfeit Clothing Worth Over $1 Million

3.   One of the individuals arrested in mid-2007 eventually became a cooperating witness ("CW") and pleaded guilty pursuant to a cooperation agreement to charges of money laundering and trafficking of counterfeit clothing.[3/]  Among other things, CW stated, in sum and substance, that one of the money laundering and counterfeit clothing co-conspirators who was not arrested in 2007 was Younes El Saleh.

4.   CW's information about Younes El Saleh was corroborated, among other things, by bank documents. Specifically, in April 2009, agents reviewed bank account records for Samar Clothing Corporation, a business registered to Younes El Saleh and a location where Younes El Saleh had previously been observed by DEA agents.  The account records for the business, which covered the period between January 2007 and February 2009, showed suspicious banking activity, including multiple deposits

---

[2/]   The investigation in the Central District of California also resulted in, among other things, the seizure of 18 kilograms of cocaine and $95,000 in narcotics proceeds.

[3/]   CW has not been sentenced yet and thus has not yet received any benefit for his cooperation.  However, CW has provided information that proved reliable, credible and accurate, and was corroborated by independent evidence.

of sequentially numbered postal money orders purchased in small amounts and at various locations in order to avoid reporting requirements.

5.   On or about July 30, 2009, the Honorable Carol B. Amon, United States District Judge for the Eastern District of New York, authorized the interception of calls over a cellular telephone used by Younes El Saleh (hereinafter, the "Younes Telephone").  This authorization was extended several times such that interception continued until approximately November 2009.

6.   On or about October 29, 2009, the New York Police Department ("NYPD") executed a judicially-authorized search of a warehouse located in Queens, New York, that was leased by Younes El Saleh.  The warrant, issued by a New York State judge, authorized the NYPD to search for and seize counterfeit clothing, as well as other evidence of counterfeit trafficking. Counterfeit clothing worth over $1 million, account ledgers and other documents were seized during that search.

7.   In or about early 2010, DEA agents observed Younes El Saleh meet with an unidentified individual inside of a parked car.  Specifically, agents observed Younes El Saleh approach the parked car, enter into the passenger front seat, and then exit that front seat approximately two minutes later.  Based on their training and experience, having witnessed individuals transfer narcotics and narcotics proceeds in that manner, agents found

Younes El Saleh's actions suspicious. Not long after agents witnessed that meeting, they stopped the unidentified individual without arresting him and seized a plastic bag containing approximately $100,000 in United States currency. Based on my training, experience and knowledge of this investigation, I believe that Younes El Saleh provided this currency to the individual during their meeting in the car and that this money was the proceeds of illegal activity, which proceeds Younes El Saleh intended to be laundered.[4]

  B. The Identification and Arrest of
    Co-Conspirator Henri Al Halabi, and
    the Seizure of Proceeds from Counterfeit Clothing

  8. One of the individuals intercepted over the Younes Telephone was Henri Al Halabi, also known as "Isaac." The conversations showed Al Halabi to be involved in the trafficking of counterfeit clothing and laundering money through a bank account he controlled in the name of Zoom Denim.

  9. According to records for that Zoom Denim bank account, from March 20, 2009 to December 15, 2009, roughly thirty-eight structured currency deposits were made into the account totaling approximately $177,992.00. None of the

---

[4] In or about December 2009, the Honorable James Orenstein, United States Magistrate Judge for the Eastern District of New York, issued an arrest warrant for Younes El Saleh. To protect the integrity of this investigation, agents decided not to arrest El Saleh at that time and instead to arrest him when other co-conspirators named in this complaint are arrested.

individual deposits exceeded $10,000, and many of the deposits were around $8,000 or were made on consecutive days. Furthermore, account records show that the account was being used as a "pass-through" account – in other words, large amounts of money were quickly deposited into the account and just as quickly withdrawn or moved to other accounts. For example, in the short span between September and November 2009, approximately $2 million was deposited into the account and approximately $2 million left the account. However, the highest balance in the account at any one time was only approximately $350,000. In addition, a recent Dun & Bradstreet report estimated that Zoom Denim has annual sales of $170,000, which low number is inconsistent with the high amount of money passing through that bank account.

10. On or about January 26, 2010, agents arrested Henri Al Halabi pursuant to a warrant issued by the Honorable Roanne L. Mann, United States Magistrate Judge for the Eastern District of New York. See <u>United States v. Al Halabi</u>, M-10-071. Agents also seized the Zoom Denim account pursuant to a separate order also issued by Judge Mann. In post-arrest statements, Al Halabi admitted, in sum and in substance, to engaging in the trafficking of counterfeit clothing and that money in the Zoom Denim account was the proceeds of that illegal activity. Al Halabi further stated, in sum and in substance, that at least

some of the business entities that bank records showed had received money drawn from the Zoom Denim account were also involved in the trafficking of counterfeit clothing.

II.   The Identification and Illegal Activity of WADIE JAAFAR

11.   In addition to providing information about Younes El Saleh as discussed above, CW stated, in sum and substance, that WADIE JAAFAR is a money laundering associate of Younes El Saleh and that CW had purchased counterfeit clothing from JAAFAR. The information provided by CW is corroborated by other evidence gathered during the 2007 investigation that led to CW's arrest. Specifically, WADIE JAAFAR's cellular telephone number (hereinafter, the "Wadie Telephone") was found stored in the cellular telephone of the individual arrested with ten kilograms of cocaine and prosecuted in the Southern District of New York.

12.   Records for Sprint Nextel show that the Wadie Telephone was registered to WADIE JAAFAR at the time it was found stored in the drug associate's telephone and continues to be registered to him.   The Wadie Telephone was also intercepted over the wiretap of the Younes Telephone.   On or about August 3, 2009, at 1:21 p.m., Younes El Saleh used the Younes Telephone to call WADIE JAAFAR on the Wadie Telephone.   This call was recorded under the authorization provided by the wiretap for the Younes Telephone.   In the conversation, WADIE JAAFAR asked if he could "give the money in the airport."   Younes El Saleh responded, "No,

that's not ok" and later added that he does not "want to take
them." However, Younes El Saleh then asked whether WADIE JAAFAR
"had them fixed/ready . . . big and like that?" WADIE JAAFAR
responded affirmatively and stated, "If you want to take them
with you, I'll give it to you in the airport." Younes El Saleh
replied, "Ok, I'll take them from you before I leave." Based on
my training, experience and knowledge of this investigation, I
believe that, in this conversation, WADIE JAAFAR asked Younes El
Saleh to take proceeds from illegal activities to Lebanon so as
to avoid detection by law enforcement. Specifically, I believe
that WADIE JAAFAR asked if he could give Younes El Saleh money at
the airport before they boarded their flight to Lebanon ("give
the money in the airport") and that Younes El Saleh initially
rejected the request ("No, that's not ok" and "want to take
them"). However, after initially rejecting the request, based on
my training, experience and knowledge of this investigation, I
believe that Younes El Saleh inquired whether the cash was hidden
well ("had them fixed/ready") and in large denominations ("big
and like that"). I further believe that, after WADIE JAAFAR
responded affirmatively and again asked if Younes El Saleh would
take the money ("If you want to take them with you, I'll give it
to you in the airport"), Younes El Saleh agreed to do so ("Ok,
I'll take them from you before I leave"). My beliefs as to the
meaning of this conversation were corroborated by events that

occurred after the conversation, as discussed in the next
paragraph.

13.  Agents checked airline records and confirmed that
Younes El Saleh and WADIE JAAFAR were scheduled to fly to Lebanon
on August 3, 2009.  FBI agents conducted surveillance at John F.
Kennedy International Airport on that date, and confirmed that
Younes El Saleh and WADIE JAAFAR boarded a flight with a final
destination of Lebanon.  However, prior to boarding, Customs and
Border Protection ("CBP") officers conducted an inspection of
Younes El Saleh and WADIE JAAFAR.  CBP officers found that Younes
El Saleh was carrying $9,500 and WADIE JAAFAR was carrying
$9,800, both amounts just under the $10,000 reporting requirement
for individuals.[5]  If WADIE JAAFAR had carried that currency
alone, he would have been subject to reporting requirements.
Thus, I believe, consistent with the above-described recorded
call, that WADIE JAAFAR had asked Younes El Saleh to carry the
money so as to avoid reporting requirements.

14.  This belief is further corroborated by agents'
observations of Younes El Saleh's and WADIE JAAFAR's behavior at
the airport before the CBP inspection.  Notably, Younes El Saleh,

_____

[5]      Under Title 31, United States Code, Section 5316, "a person
. . . shall file a report . . . when the person . . . knowingly
transports, is about to transport, or has transported, monetary
instruments of more than $10,000 at one time from a place in the
United States to or through a place outside the United States[.]"
Failure to adhere to this reporting requirement is a felony
offense.  See 31 U.S.C. § 5332.

WADIE JAAFAR and a third male met at the airport prior to going through the security checkpoint.  However, all three appeared to take conscious steps to avoid going through the security checkpoint together.  Specifically, after they met, WADIE JAAFAR went through the security checkpoint first while Younes El Saleh and the other male stayed behind.  Approximately twenty minutes later, the other male passed through the checkpoint while Younes El Saleh continued to stay behind.  Approximately twenty minutes after that, Younes El Saleh passed through the checkpoint. Subsequent to passing through the checkpoint, all three individuals met up again.  Thus, I believe, consistent with the above-described recorded call, that these actions by WADIE JAAFAR and Younes El Saleh demonstrate their intent to transport money so as to avoid reporting requirements and detection by law enforcement.

15.  On or about October 21, 2009, the Honorable Carol B. Amon, United States District Judge for the Eastern District of New York, authorized the interception of calls over the Wadie Telephone.  The conversations intercepted over the Wadie Telephone showed WADIE JAAFAR to be involved in counterfeit clothing trafficking and illegal financial activities.

16.  On October 24, 2009, at 10:46 a.m., WADIE JAAFAR called an unidentified male using the Wadie Telephone.  In that conversation, the unidentified male stated, "Nassri went on the

way/road, they took/arrested him" and added, "You can't play exposed like that . . . keep bringing customers from the outside and everything[.]"  WADIE JAAFAR responded, "Really?"  The unidentified male replied, "The reality is that police is here whole day.  For the last two years it was down[,] they left, now that it starting picking up they . . . ."  Agents believe that, in this conversation, WADIE JAAFAR and the unidentified male discussed the arrest of a counterfeit clothing and money laundering associate.  Specifically, agents believe that the unidentified male informed WADIE JAAFAR that their associate was arrested ("Nassri went on the way/road, they took/arrested him") and WADIE JAAFAR responded in disbelief ("Really?").  Agents further believe that the unidentified male commented that this associate made the mistake of dealing with individuals whom he did not know well ("You can't play exposed like that . . . keep bringing customers from the outside and everything"), and that the police, after being relaxed about enforcement for several years, are now aggressive again ("police is here whole day.  For the last two years it was down[,] they left, now that it starting picking up").

17.  On October 30, 2009, at 11:23 a.m., WADIE JAAFAR received a call on the Wadie Telephone from Younes El Saleh.[6]

_____

[6]   As discussed above, the day before, on October 29, 2009, the NYPD, acting in concert with the DEA and FBI, executed a judicially-authorized search of Younes El Saleh's warehouse and seized over $1 million worth of counterfeit clothing.

In this conversation, Younes El Saleh told WADIE JAAFAR that he
(El Saleh) "is not well[.]" Younes El Saleh added, "I'll talk to
you later, big thing have happened in the warehouse." WADIE
JAAFAR responded, "Since long time ago we've asked you to leave."
Agents believe that, in this conversation, Younes El Saleh stated
that he was unhappy ("not well") and the reason for his
unhappiness was the police raid on his Queens warehouse ("big
thing have happened in the warehouse"). Agents further believe
that WADIE JAAFAR responded to El Saleh by stating that he
(JAAFAR) had previously warned Younes El Saleh to change the
warehouse location so as to avoid detection by law enforcement
("Since long time ago we've asked you to leave").

18. On November 1, 2009, at 10:52 a.m., WADIE JAAFAR
called an unidentified female using the Wadie Telephone. In that
conversation, the unidentified female asked, "Do [you] have any
merchandise to makes some money?" WADIE JAAFAR responded, "I
just got email from someone tomorrow [who will] give some samples
. . . they are good and I have some alligator too." Agents
believe that, in this conversation, WADIE JAAFAR and the
unidentified female discussed the availability of counterfeit
clothing and that "alligator" is code for Izod or Lacoste brand
clothing. Specifically, agents believe that the unidentified
female asked WADIE JAAFAR if he could provide counterfeit
clothing ("Do [you] have any merchandise to makes some money?")

and that WADIE JAAFAR responded that he expected to get some counterfeit clothing samples tomorrow in addition to the Izod or Lacoste merchandise the he already had ("I just got email from someone tomorrow [who will] give some samples . . . they are good and I have some alligator too").

19.  Later that day, at 4:20 p.m., WADIE JAAFAR received a call on the Wadie Telephone from Younes El Saleh.  In the conversation, WADIE JAAFAR asked if "they left a paper?" and Younes El Saleh repled, "They left a paper of the merchandise they took."  WADIE JAAFAR then advised Younes El Saleh, "not to talk about what happened" and "to get another phone, a 'prepaid card'."  Agents believe that, in this conversation, WADIE JAAFAR and Younes El Saleh again discussed the law enforcement search of El Saleh's warehouse and the seizure of counterfeit clothing.  Specifically, agents believe that WADIE JAAFAR asked if the individuals who seized the merchandise had left documents detailing what was seized ("they left a paper?"), and Younes El Saleh stated that such a document was in fact left behind ("They left a paper of the merchandise they took").  Agents further believe that WADIE JAAFAR then advised Younes El Saleh not to openly discuss the seizure and to get a new cellular telephone – a prepaid telephone that is more difficult to monitor – for added security against law enforcement ("not to talk about what happened" and "to get another phone, a 'prepaid card'").

20.   On November 8, 2009, at 5:19 p.m., WADIE JAAFAR used the Wadie Telephone to call an unidentified female, also known as "Maha."  In this conversation, WADIE JAAFAR asked "Maha" whether she "showed Lacoste to anyone?"  "Maha" responded negatively, adding "their material is really bad and cheap" and she "would not even bother showing them to anyone."  WADIE JAAFAR disagreed, "they are really good."  Agents believe that, in this conversation, WADIE JAAFAR and the unidentified female, also known as "Maha," discussed the quality of the counterfeit Lacoste clothing WADIE JAAFAR had provided.  Specifically, agents believe that WADIE JAAFAR asked "Maha" whether she had tried to sell the counterfeit Lacoste clothing ("showed Lacoste to anyone?") and "Maha" replied that she did not because the clothing looked obviously counterfeit ("their material is really bad and cheap" and "would not even bother showing them to anyone").  Agents believe that WADIE JAAFAR disagreed with that assessment ("they are really good").

III.   The Identification and Illegal Activity of HAIDAR AYOUB

21.   One of the individuals intercepted over the above-described wiretaps was defendant HAIDAR AYOUB.  For example, on or about October 19, 2009, Younes El Saleh used the Younes Telephone to call HAIDAR AYOUB.  In that conversation, Younes El Saleh asked HAIDAR AYOUB to "give a check to HASSAN HAMDAN for

the price of the jackets."[2/]   HAIDAR AYOUB responded, "Ok . . .

do not worry" and explained that he would "add it to your

account[.]"   HAIDAR AYOUB also commented that "it is only three

dozen[.]"   Based on my training, experience and knowledge of this

investigation, I believe that, in this conversation, Younes El

Saleh and HAIDAR AYOUB are discussing settling a debt for

counterfeit clothing ("give a check" and "add it to your

account"), specifically three dozen jackets ("for the price of

the jackets" and "only three dozen").   This belief is

corroborated by the additional conversations discussed below.

22.   On or about October 24, 2009, Younes El Saleh used

the Younes Telephone to call HAIDAR AYOUB.   In that conversation,

Younes El Saleh asked, "Can you send me a check Monday?" and

HAIDAR AYOUB responded, "Sure, ok."   Younes El Saleh then stated,

"You took 7 boxes of jackets."   HAIDAR AYOUB responded, "Yes[,]

minus one piece."   Based on my training, experience and knowledge

of this investigation, I believe that, in this conversation,

Younes El Saleh and HAIDAR AYOUB are again discussing settling a

debt for counterfeit clothing ("Can you send me a check"),

specifically seven boxes of jackets ("You took 7 boxes of

---

[2/]   Immediately prior to this call with HAIDAR AYOUB, Younes El
Saleh spoke with co-conspirator HASSAN HAMDAN.   The call with
HASSAN HAMDAN is discussed below and corroborates my beliefs
about the illegal activities discussed in this call with HAIDAR
AYOUB.

jackets" and "Yes[,] minus one piece"). This belief is corroborated by the additional conversations discussed below.

23. On or about October 31, 2009, HAIDAR AYOUB called Younes El Saleh on the Younes Telephone. In that conversation, Younes El Saleh stated, "I felt dizzy today." HAIDAR AYOUB then asked if "it's the company?" Younes El Saleh responded, "It is the company but they took everything, the Black Label, the Cuggi" and added, "they didn't leave anything, no Black Label, no Cuggi, no Akademic long sleeves, there was like 3000 or 4000 pieces." HAIDAR AYOUB commented, "I knew it was the company[.] If they were the others, they [would] have waited for you there[.]" Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Younes El Saleh and HAIDAR AYOUB discussed the raid on El Saleh's warehouse, described above, that resulted in the seizure of over $1 million worth of counterfeit goods. Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, "the company" refers to clothing industry representatives and "the others" refers to law enforcement. Specifically, I believe that Younes El Saleh expressed that he was upset about the raid ("I felt dizzy today") and told HAIDAR AYOUB that industry representatives had seized all of his counterfeit clothing ("It is the company but they took everything, the Black Label, the Cuggi" and "they didn't leave

anything, no Black Label, no Cuggi, no Akademic long sleeves, there was like 3000 or 4000 pieces"). I further believe that HAIDAR AYOUB responded that he agreed that it was industry representatives who seized the clothing, rather than law enforcement, because law enforcement would have stayed at the location to arrest Younes El Saleh ("I knew it was the company[.] If they were the others, they [would] have waited for you there").[8/]

24. HAIDAR AYOUB was identified as the speaker in these conversations through various means. First, CW is familiar with HAIDAR AYOUB through CW's counterfeit clothing activities and CW has stated, in sum and substance, that the number of the telephone noted above is among the numbers he/she knows to pertain to HAIDAR AYOUB. Second, in wiretap recordings with Younes El Saleh, an individual using that above-noted telephone made plans with Younes El Saleh to meet at El Saleh's warehouse. Subsequent wiretap conversations appear to refer to that meeting and mention "Haidar" as the apparent participant at the meeting. Thus, based on my training, experience and knowledge of this investigation, I believe that HAIDAR AYOUB is the speaker the above-described conversations.

---

[8/]    Notably, this conversation also confirms my belief that HAIDAR AYOUB knows that the clothing that he is trafficking is counterfeit.

IV.   The Identification and Illegal Activity of YOUSSEF AYOUB

25.   Another of the individuals intercepted over the
above-described wiretaps was defendant YOUSSEF AYOUB.   For
example, on or about October 12, 2009, Younes El Saleh used the
Younes Telephone to call YOUSSEF AYOUB to discuss supplying
counterfeit clothing to YOUSSEF AYOUB, which clothing YOUSSEF
AYOUB would then re-sell.   Specifically, Younes El Saleh told
YOUSSEF AYOUB that he had "new Kojjie and black label,"
continuing, "it's new one[,] you never see it before in your
life."   YOUSSEF AYOUB asked Younes El Saleh to "send some . . .
you have for women."   Younes El Saleh pressed YOUSSEF AYOUB to
"take [a] box or two," to which YOUSSEF AYOUB responded, "I do
not want to [get stuck] with it[,] and you do not accept
return[s]."   Younes El Saleh responded, "what return[?] it's very
cheap price," and told YOUSSEF AYOUB, "I'm saving you a lot of
money in shipping . . . the guy last week . . . one [of my]
customer[s] took two boxes to UPS and they charged him $71."
YOUSSEF AYOUB replied, "That guy [at] UPS on 22 [Street] is a
thief . . . he knows that the boxes [have] bootleg goods and he
charge[s] double and no one would talk."   Younes El Saleh
responded, "That guy    . . . he charges $20 extra on each box
for his pocket.   He makes $2000 or $3000 for himself."   Based on
my training, experience and knowledge of this investigation, I
believe that, in this conversation, Younes El Saleh and YOUSSEF

AYOUB discussed a future counterfeit clothing sales transaction and the associated shipping costs. Specifically, I believe that Younes El Saleh offered to sell counterfeit Coogi and Black Label clothing to YOUSSEF AYOUB ("I have new Kojjie and black label"), explaining to YOUSSEF AYOUB that the clothing were new styles ("it's new one[,] you never see it before in your life"). I believe that YOUSSEF AYOUB accepted El Saleh's offer ("send some . . . you have for women"), albeit reluctantly, because he was worried that El Saleh would not accept returns if the counterfeit clothing did not sell ("I do not want to [get stuck] with it[,] and you do not accept return[s]"). In response, I believe that Younes El Saleh told YOUSSEF AYOUB that he should not worry about the returns because the price El Saleh was offering YOUSSEF AYOUB was cheap ("what return[,] it's very cheap price"), and El Saleh was saving YOUSSEF AYOUB money on shipping costs associated with the counterfeit clothing ("I'm saving you a lot of money in shipping"). I further believe that both Younes El Saleh and YOUSSEF AYOUB were lamenting that they had no recourse but to accept inflated shipping costs based on the nature of their business, i.e. trafficking in counterfeit clothing ("That guy [at] UPS on 22 [Street] is a thief . . . he knows that the boxes [have] bootleg goods and he charge[s] double and no one would talk.").

26.  On or about October 29, 2009, YOUSSEF AYOUB called Younes El Saleh on the Younes Telephone.  In that conversation, YOUSSEF AYOUB asked Younes El Saleh to have "a dozen of each style of the large pants [sent] to the other store."  Younes El Saleh responded, "The warehouse is gone."  YOUSSEF AYOUB then asked Younes El Saleh if the police were "going to come get him."  Younes El Saleh responded that he "[did] not know" and that he was on his way into the warehouse when he "saw the police in there."  YOUSSEF AYOUB then asked Younes El Saleh "if the warehouse is under his [Younes's] name," to which Younes El Saleh responded affirmatively.  YOUSSEF AYOUB then told El Saleh "not to go near" the warehouse, "to stay far away."  Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Younes El Saleh and YOUSSEF AYOUB discussed the raid on El Saleh's warehouse, described above, that resulted in the seizure of over $1 million worth of counterfeit goods.  I also believe that YOUSSEF AYOUB initially telephoned Younes El Saleh to place an order for counterfeit clothing (have "a dozen of each style of the large pants [sent] to the other store").  I further believe that, once YOUSSEF AYOUB learned about the raid on Younes El Saleh's warehouse, YOUSSEF AYOUB inquired as to whether the warehouse was in El Saleh's name and admonished El Saleh to stay away from the warehouse ("stay far away") because he was aware that the warehouse contained

evidence of illegal activity, namely trafficking in counterfeit clothing.

  27. On or about November 2, 2009, YOUSSEF AYOUB called Younes El Saleh on the Younes Telephone. In that conversation, YOUSSEF AYOUB asked Younes El Saleh why "the situation is not straight yet." Younes El Saleh responded, in sum and substance, that he did not know who came into the warehouse. YOUSSEF AYOUB asked if "they left a paper?" Younes El Saleh replied that "they do leave a paper but [it] has no address no nothing." YOUSSEF AYOUB stated, "Now it is clear[.] It is companies . . . maybe they stole you and you don't know." Younes El Saleh responded, "No, they left a paper, and put down what they took and what they didn't take. The papers has no address or phone or anything. It is impossible that will be the police. The last time this happened to me by companies they left me a yellow paper without address, and also white paper with what they took." YOUSSEF AYOUB responded, "If they are thief[,] they would not leave you anything." Younes El Saleh then asked, "How come they didn't take the North Face or the Black Label[?] They didn't even take the Polo[,] everything that was in the rear." Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Younes El Saleh and YOUSSEF AYOUB discussed, once again, the raid on El Saleh's warehouse, described above. I further believe that, in this conversation,

"the company" refers to clothing industry representatives, and
that Younes El Saleh was discussing a previous seizure of
counterfeit goods from his warehouse by these clothing industry
representatives ("The last time this happened to me by companies
they left me a yellow paper without address, and also white paper
with what they took").  I also believe that YOUSSEF AYOUB and
Younes El Saleh expressed their belief that clothing industry
representatives, rather than the police or robbers, had raided El
Saleh's warehouse based on the nature of the "paper" that was
left ("it is impossible that will be the police" and "If they are
thief[,] they would not leave you anything.").

     28.  On or about November 3, 2009, YOUSSEF AYOUB called
Younes El Saleh on the Younes Telephone.  In that conversation,
Younes El Saleh asked YOUSSEF AYOUB if he had received "the new
invoice" and they also discuss an "old invoice" sent by El Saleh
to YOUSSEF AYOUB.  YOUSSEF AYOUB then asked Younes El Saleh, in
sum and substance, whether he (YOUSSEF AYOUB) should put the
money for payment of both invoices into Younes El Saleh's bank
account.  Younes El Saleh responded affirmatively but told
YOUSSEF AYOUB "to deposit $9800 so they will not ask . . .
questions."  YOUSSEF AYOUB agreed to do as Younes El Saleh
directed.  Based on my training, experience and knowledge of this
investigation, I believe that, in this conversation, YOUSSEF
AYOUB and Younes El Saleh discussed a new invoice for counterfeit

clothing sent to YOUSSEF AYOUB by Younes El Saleh ("new invoice"), as well as a previous debt owed by YOUSSEF AYOUB to El Saleh for counterfeit clothing ("old invoice"). I also believe that Younes El Saleh instructed YOUSSEF AYOUB on how to pay for the counterfeit clothing Younes El Saleh sold to YOUSSEF AYOUB in such a manner as to avoid detection and conceal and further their illegal activity, namely trafficking in counterfeit clothing. Specifically, I believe that "they" refers to bank employees, and that Younes El Saleh instructed YOUSSEF AYOUB to deposit less than $10,000 so that the bank employees would not grow suspicious or report the deposit to law enforcement authorities ("deposit $9800 so they will not ask . . . questions").

29. YOUSSEF AYOUB was identified as the speaker in these conversations through various means. First, CW is familiar with YOUSSEF AYOUB through CW's counterfeit clothing activities and CW has stated, in sum and substance, that the number of the telephone noted above is among the numbers he/she knows to pertain to YOUSSEF AYOUB. Second, in wiretap recordings with Younes El Saleh, Younes El Saleh gave the above-noted telephone number to an individual who asked for "Youssef's" telephone number. Thus, based on my training, experience and knowledge of this investigation, I believe that YOUSSEF AYOUB is the speaker in the above-described conversations.

V.    The Identification and Illegal Activity of ALI ATA SALEH

            30.   Another of the individuals intercepted over the
above-described wiretaps was defendant ALI ATA SALEH.   For
example, on or about August 3, 2009, Younes El Saleh used the
Younes Telephone to call ALI ATA SALEH, who answered a land line
registered to "Yasmine Sportswear."   During that conversation,
ALI ATA SALEH stated, "there is nothing" and "it is slow."
Younes El Saleh then asked "if the . . . the colored one is
sold?"   ALI ATA SALEH responded, "we have plenty" but added
"there is few of purple, black, red[.]"   Based on my training,
experience and knowledge of this investigation, I believe that,
in this conversation, Younes El Saleh and ALI ATA SALEH discussed
whether sales of counterfeit clothing were being made at the
store that ALI ATA SALEH operates.   Specifically, I believe that
ALI ATA SALEH stated that sales were slow ("there is nothing" and
"it is slow").   I further believe that Younes El Saleh then
inquired about the sales of a specific counterfeit clothing item
("if the . . . the colored one is sold?") and ALI ATA SALEH
responded that the item was, similarly, not selling well ("we
have plenty") but that others were, causing there to be fewer of
those items ("there is few of purple, black, red").   These
beliefs are corroborated by information provided by CW, who
identified a picture of ALI ATA SALEH and stated, in sum and
substance, that ALI ATA SALEH operates a counterfeit clothing

store.   These beliefs are further corroborated by conversations
discussed below.

        31.   Later that day, ALI ATA SALEH used a cellular
telephone registered to him to call Younes El Saleh on the Younes
Telephone.   In that conversation, Younes El Saleh instructed ALI
ATA SALEH, "In the check book[,] there is an envelope where there
[are] money orders that adds up to almost 20 thousand[.]   Leave
them there [and] when the bill[s] come[,] put 600, 700, however
the bill comes.   You pay as much as the money order."   Younes El
Saleh further instructed ALI ATA SALEH, "You have money orders
with all amounts, 600, 700, 800, 1000, 500, 300[.]   Choose the
closest one to the price.   It is ok if it is a little over or a
little shorter."   Based on my training, experience and knowledge
of this investigation, I believe that, in this conversation,
Younes El Saleh provided instruction to ALI ATA SALEH about how
to conduct the finances of the counterfeit clothing store, which
Younes El Saleh left for ALI ATA SALEH to operate while Younes El
Saleh was in Lebanon, as noted above.   Specifically, I believe
that Younes El Saleh explained that he had approximately $20,000
in money orders ("there [are] money orders that adds up to almost
20 thousand") with various amounts and with the intended
recipient left blank ("You have money orders with all amounts,
600, 700, 800, 1000, 500, 300").   I further believe that Younes
El Saleh instructed ALI ATA SALEH that, when bills from

counterfeit clothing suppliers arrived, ALI ATA SALEH should use a money order with an amount that was similar to the bill ("when the bill[s] come[,] put 600, 700, however the bill comes. You pay as much as the money order" and "Choose the closest one to the price. It is ok if it is a little over or a little shorter"). Based on my training, experience and knowledge of this investigation, I believe that Younes El Saleh and ALI ATA SALEH used this financial scheme, which involved pre-purchased money orders with fixed amounts but blank intended recipients, in order to conceal and further their illegal activity, namely trafficking in counterfeit clothing.

32. On or about August 26, 2009, Younes El Saleh used the Younes Telephone to call ALI ATA SALEH, who answered a land line registered to "Yasmine Sportswear." During that conversation, Younes El Saleh asked ALI ATA SALEH about "the book, money order[s] and the checks." ALI ATA SALEH responded, "Yes, all here[.]" Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Younes El Saleh and ALI ATA SALEH discussed the status of the counterfeit clothing store, which Younes El Saleh left for ALI ATA SALEH to operate while Younes El Saleh was in Lebanon, as noted above. Specifically, I believe that Younes El Saleh asked whether ALI ATA SALEH had properly maintained the business ledger and kept track of monetary receipts ("the book,

money order[s] and the checks"), to which ALI ATA SALEH replied
affirmatively ("Yes, all here").

    33.  On or about October 30, 2009, ALI ATA SALEH called
Younes El Saleh on the Younes Telephone.  During that
conversation, ALI ATA SALEH stated, "I went in the morning to the
warehouse and saw nothing . . . the place was closed, and
everything was ok, hope nothing was gone."  Younes El Saleh
responded, "you can see nothing[,] they took everything."  ALI
ATA SALEH then asked, "They took the goods, uncle?"  Younes El
Saleh answered, "Yes[,] took everything . . . the super[intendant
of the building] told me they came 6 am and took a container,
very big truck."  ALA ATA SALEH responded, "Some Arab rats called
on you" and added, "Next time you take a warehouse[,] you do not
tell anybody[,] not even your brother."  Based on my training,
experience and knowledge of this investigation, I believe that,
in this conversation, Younes El Saleh and ALI ATA SALEH discussed
the seizure of over $1 million dollars worth of counterfeit
clothing from Younes El Saleh's warehouse.  Specifically, I
believe that ALI ATA SALEH stated that he passed by the warehouse
location and all seemed in order ("I went in the morning to the
warehouse and saw nothing . . . the place was closed, and
everything was ok").  Younes El Saleh then explained that,
although it was not visible from outside the warehouse ("you can
see nothing"), which was ALI ATA SALEH's vantage point, all the

counterfeit clothing was seized ("they took everything" and "Yes[,] took everything").  I further believe that ALI ATA SALEH then opined that persons of Arabic descent had informed law enforcement about the presence of counterfeit clothing in that warehouse ("Some Arab rats called on you") and advised Younes El Saleh that, in the future, he should be more careful to hide the locations of contraband storage facilities ("Next time you take a warehouse[,] you do not tell anybody[,] not even your brother").[2/]

34.  ALI ATA SALEH was identified as the speaker in these conversations through various means.  First, Younes El Saleh referred to the speaker in some of the wiretap conversations as "Ali."  Second, the cellular telephone discussed above is registered to ALI ATA SALEH with an address that is consistent with the address ascribed to ALI ATA SALEH according to the Department of Motor Vehicles and other public database records.  Agents have conducted surveillance of ALI ATA SALEH and confirmed that the address does, in fact, pertain to ALI ATA SALEH.  Finally, CW stated, in sum and substance, that ALI ATA SALEH operates a counterfeit clothing business located at 1205 Broadway on the second floor, which location matches the

---

[2/]   Notably, this conversation also confirms my belief that ALI ATA SALEH knows that the clothing that he is selling in Younes El Saleh's store is counterfeit and that the finances he handled while Younes El Saleh was in Lebanon were the proceeds of illegal activity.

subscriber records for "Yasmine Sportswear."  In addition, CW
stated, in sum and substance, that ALI ATA SALEH is Younes El
Saleh's nephew.  The intercepted calls corroborate this
information.  Notably, the speaker addresses Younes El Saleh as
"uncle" in several conversations.

VI.  <u>The Identification and Illegal Activity of AYMAN JAAFAR</u>

   35.  Another of the individuals intercepted over the
above-described wiretaps was defendant AYMAN JAAFAR, also known
as "Mohammad" and "Abu Jameel."  For example, on or about October
31, 2009, WADIE JAAFAR used the Wadie Telephone to call AYMAN
JAAFAR.  During that conversation, WADIE JAAFAR asked AYMAN
JAAFAR if he (AYMAN JAAFAR) "has an email," to which AYMAN JAAFAR
replied affirmatively.  WADIE JAAFAR then instructed AYMAN JAAFAR
to "text it" so that he (WADIE JAAFAR) could send "pictures of
the sample."  AYMAN JAAFAR again responded affirmatively.  Based
on my training, experience and knowledge of this investigation, I
believe that, in this conversation, AYMAN JAAFAR and WADIE JAAFAR
discussed exchanging email addresses ("has an email" and "text
it") so that WADIE JAAFAR could provide to AYMAN JAAFAR
photographs of samples of counterfeit athletic clothing for the
purpose of AYMAN JAAFAR determining whether he could sell that
counterfeit clothing ("pictures of the sample").  This belief is
corroborated by the additional conversation described below, as

well as the subsequent seizure of counterfeit clothing discussed below.

36. On or about November 5, 2009, AYMAN JAAFAR called WADIE JAAFAR on the Wadie Telephone. In that conversation, AYMAN JAAFAR stated, "I saw it[;] it is not [a] jersey." WADIE JAAFAR stated, "it is [a] jersey." AYMAN JAAFAR disagreed, stating the photograph was of "jackets." AYMAN JAAFAR then inquired whether WADIE JAAFAR "have some Yankee jacket[s], there is a huge demand, they win the world series." WADIE JAAFAR responded, "Let me see if there is anything and I'll call you." Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, AYMAN JAAFAR and WADIE JAAFAR discussed whether WADIE JAAFAR could provide counterfeit athletic clothing to AYMAN JAAFAR so that he could sell that counterfeit clothing. Specifically, in this conversation, AYMAN JAAFAR complained to WADIE JAAFAR that the pictures of counterfeit clothing samples that WADIE JAAFAR had sent were of jackets rather than jerseys ("it is not [a] jersey"), and WADIE JAAFAR disagreed with that description of the samples ("it is [a] jersey"). I further believe that AYMAN JAAFAR asked if WADIE JAAFAR could get counterfeit New York Yankees baseball jackets ("have some Yankee jacket[s], there is a huge demand, they win the world series") and that WADIE JAAFAR replied that he would check on the availability of that counterfeit clothing ("Let me see if there

is anything and I'll call you"). This belief is corroborated by the subsequent seizure of counterfeit clothing discussed below.

37. On or about December 4, 2009, NYPD arrested three individuals, including AYMAN JAAFAR, during the execution of a search warrant at 1133 Broadway in Manhattan, New York. A search of the location revealed approximately 3,000 counterfeit athletic jerseys. AYMAN JAAFAR was present in the location when NYPD entered and he had in his possession keys to the location. In addition, NYPD retrieved a plastic bag that appeared to have been thrown out of a window in that location. Inside the plastic bag were AYMAN JAAFAR's wallet and approximately $2,600 in United States currency.

38. AYMAN JAAFAR was identified as the speaker in these conversations through various means. First, at the time of his arrest, he possessed the cellular telephone that was used in the conversations described above. Second, prior to AYMAN JAAFAR's arrest by the NYPD, CW was shown a series of photographs and identified one of the photographs as that of AYMAN JAAFAR. CW stated, in sum and substance, that AYMAN JAAFAR sold counterfeit athletic clothing from a location at 1133 Broadway.

VII. The Identification and Illegal Activity of
     HUSSEN ALI CHAHINE

39. Another of the individuals intercepted over the above-described wiretaps was defendant HUSSEN ALI CHAHINE, also known as "Hussein." For example, on or about October 7, 2009,

Younes El Saleh used the Younes Telephone to call HUSSEN ALI

CHAHINE.  In this conversation, HUSSEN ALI CHAHINE asked Younes

El Saleh if he (HUSSEN ALI CHAHINE) "can use people from New

Jers[e]y" to deliver some "goods" that he (HUSSEN ALI CHAHINE)

was sending.  Younes El Saleh asked "if the same [company] is

going to do the pick up?"  HUSSEN ALI CHAHINE responded

affirmatively, adding that "it would be better to store [the

goods] in [New Jersey]."  Younes El Saleh agreed with HUSSEN ALI

CHAHINE, telling HUSSEN ALI CHAHINE that he should either put his

own address on the "goods" or the address of the "the guy who

would do the drop off."  HUSSEN ALI CHAHINE responded that "the

guy who would make the drop off does not want to place his

address [on the goods]."  Based on my training, experience and

knowledge of this investigation, I believe that, in this

conversation, Younes El Saleh and HUSSEN ALI CHAHINE discussed

the transportation and temporary storage of counterfeit goods

using a delivery company based in New Jersey ("it would be better

to store [the goods] in [New Jersey]").  I also believe that

HUSSEN ALI CHAHINE confirmed that the delivery pertained to

counterfeit goods when he acknowledged the delivery person's

reluctance to place his own address on the shipping label ("the

guy who would make the drop off does not want to place his

address [on the goods]").

40.   On or about October 16, 2009, HUSSEN ALI CHAHINE called Younes El Saleh on the Younes Telephone.   In this conversation, HUSSEN ALI CHAHINE told Younes El Saleh that he (HUSSEN ALI CHAHINE) sold "merchandise" to a third party.[10/] HUSSEN ALI CHAHINE stated, "I send him the picture of some Joe Jeans[.]   He liked them[.]   I send them to him and now he said [']I don't want them.[']"   Younes El Saleh asked HUSSEN ALI CHAHINE, "If [he] can't return [the jeans]."   HUSSEN ALI CHAHINE responded, "No, they are fake."   Based on my training, experience and knowledge of this investigation, I believe that in this conversation, HUSSEN ALI CHAHINE and Younes El Saleh discussed a sale of counterfeit clothing made by HUSSEN ALI CHAHINE to a third party ("merchandise").   I further believe that HUSSEN ALI CHAHINE discussed how he obtained the counterfeit jeans for the third party after the third party expressed interest in the counterfeit jeans upon seeing a photograph ("I send him the picture of some Joe Jeans[.]   He liked them[.]").   I believe that HUSSEN ALI CHAHINE then stated that after he obtained the counterfeit jeans for the third party, the third party said that he did not want the jeans ("I send them to him and now he said [']I don't want them.[']").   I further believe that HUSSEN ALI

_____

[10/]   The recorded conversation references "Haj Youssef" as the third party.   Based on my knowledge of this investigation, I believe that, in this conversation, the third party whom Younes El Saleh and HUSSEIN CHAHINE referenced is the defendant YOUSSEF AYOUB.

CHAHINE complained to Younes El Saleh that he (HUSSEN ALI CHAHINE) could not "return" the jeans after the third party decided he did not want them because they were counterfeit ("they are fake").

41. On or about October 27, 2009, Younes El Saleh used the Younes Telephone to call HUSSEN ALI CHAHINE. In this conversation, HUSSEN ALI CHAHINE and Younes El Saleh discussed a website specializing in the sales of various brands of counterfeit clothing. Specifically, HUSSEN ALI CHAHINE told Younes El Saleh that he had emailed Younes El Saleh a "link to the website with all the brands in it, including Akademiks, Alpha Dodger, Azuri, Bathing Ape, Diesel, and Coogi." Younes El Saleh asked HUSSEN ALI CHAHINE if "all those [brands] were originals?" HUSSEN ALI CHAHINE responded, "No. They are all counterfeit." HUSSEN ALI CHAHINE then told Younes El Saleh to "look at the brand names and see what [you want]" so that HUSSEN ALI CHAHINE "can call . . . to ask . . . for a price." Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, HUSSEN ALI CHAHINE stated that he had sent Younes El Saleh a link to a website specializing in counterfeit clothing brands ("including Akademiks, Alpha Dodger, Azuri, Bathing Ape, Diesel, and Coogi"). I further believe that HUSSEN ALI CHAHINE stated that all of the clothing for sale on the website was counterfeit ("They are all counterfeit") and that he

would facilitate obtaining the counterfeit clothing for Younes El Saleh ("look at the brand names and see what [you want]" and "can call . . . to ask . . . for a price").

42. HUSSEN ALI CHAHINE was identified as the speaker in these conversations because he is listed as the subscriber of record for the telephone number noted above.  Furthermore, public records, including Department of Motor Vehicles records, list HUSSEIN CHAHINE as residing at the address provided in the subscriber records for the above-noted telephone number.  Thus, based on my training, experience and knowledge of this investigation, I believe that HUSSEN ALI CHAHINE is the speaker in the above-described conversations.

PAGES 38- 41 REDACTED

IX.  <u>The Identification and Illegal Activity of HASSAN ALI HAMDAN</u>

47.  Another of the individuals intercepted over the above-described wiretaps was defendant HASSAN ALI HAMDAN.  For example, on or about October 19, 2009, HASSAN ALI HAMDAN ("HAMDAN") called Younes El Saleh on the Younes Telephone.  In this conversation, HAMDAN asked Younes El Saleh if he "wants money today?"  El Saleh responded that he (Younes El Saleh) is "not going to force" HAMDAN.  HASSAN ALI HAMDAN replied that he wanted to give El Saleh "some money and tomorrow will give the rest."  HAMDAN continued that he was waiting for some individuals to "send him like 10" and that he had "some also, just to accumulate today, to be a sizable amount."  Later in the conversation, while discussing a debt owed to one of them by another individual,[11/] HASSAN ALI HAMDAN asked, regarding this other individual, "Where is all the money he makes, where it goes?"  Younes El Saleh responded, "Everyday a person is traveling[,] one comes and one goes . . . everyone [who] travel[s] takes with him $9,500."  HASSAN ALI HAMDAN responded, "What is this means, when you owe money, you do not pay and send money abroad?"  Based on my training, experience and knowledge of

---

[11/]  Based on my training, experience and knowledge of this investigation, I believe that this individual is in fact either defendant YOUSSEF AYOUB or defendant HAIDAR AYOUB.

this investigation, I believe that, in this conversation, HASSAN ALI HAMDAN and Younes El Saleh discussed a debt owed by HAMDAN to El Saleh ("some money and tomorrow will give the rest").  I also believe that HASSAN ALI HAMDAN and El Saleh then discussed a debt owed by another individual, and how this individual sent his money abroad instead of paying his debts ("What is this means, when you owe money, you do not pay and send money abroad?").  I believe that the "$9,500" referenced in their conversation regarding sending money abroad ("everyday a person is traveling[,] one comes and one goes . . . everyone [who] travel[s] takes with him $9,500") shows both HASSAN ALI HAMDAN's and El Saleh's knowledge with respect to how to export United States currency abroad in such a manner as to avoid detection by law enforcement and conceal and further illegal activity, namely trafficking in counterfeit clothing.

48.   On or about October 29, 2009, at approximately 3:09 p.m., Younes El Saleh, using the Younes Telephone, called HASSAN ALI HAMDAN.  Younes El Saleh told HASSAN ALI HAMDAN not to come and that "the warehouse is gone."  HASSAN ALI HAMDAN asked El Saleh, "How is this happened?"  El Saleh replied, "The police, the police is inside, damn."  HASSAN ALI HAMDAN told El Saleh to "Leave, do not stay there" and continued, "For sure they have our pictures and the car numbers also."  Based on my training, experience and knowledge of this investigation, I believe that

Younes El Saleh called HASSAN ALI HAMDAN from the vicinity of El Saleh's warehouse shortly after the raid described above that resulted in the seizure of over $1 million worth of counterfeit goods ("The police, the police is inside, damn").  I also believe that HASSAN ALI HAMDAN instructed El Saleh to leave the vicinity of the warehouse ("Leave, do not stay there") because he was afraid that the police would be able to identify them through photographs and/or license plate numbers ("For sure they have our pictures and the car numbers also").

49.  On or about October 29, 2009, at approximately 5:03 p.m., HASSAN ALI HAMDAN called Younes El Saleh on the Younes Telephone.  HAMDAN and told Younes El Saleh that he (HASSAN ALI HAMDAN) "just passed in front of the warehouse" and "everything is locked."  El Saleh asked HAMDAN "if it is one or two locks?"  HASSAN ALI HAMDAN replied "only one" and told El Saleh that he "is turning back to look, but is afraid they will follow" him because he had "goods in the car."  Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Younes El Saleh and HASSAN ALI HAMDAN discussed, once again, the raid on El Saleh's warehouse, described above.  I further believe that HASSAN ALI HAMDAN had gone to the warehouse shortly after the raid and described to El Saleh what he saw ("just passed in front of the warehouse" and "everything is locked").  I also believe that HASSAN ALI HAMDAN

expressed fear that the police would follow him, which he did not
want to occur because he had additional counterfeit clothing in
his car ("afraid they will follow" and "goods in the car").

50. On or about October 29, 2009, at approximately
5:17 p.m., HASSAN ALI HAMDAN called Younes El Saleh on the Younes
Telephone to discuss again the raid on El Saleh's warehouse.  El
Saleh asked HAMDAN "if it possibly was the company?"  HASSAN ALI
HAMDAN replied, "For sure they were the company[,] not the
police."  HAMDAN asked El Saleh whether he (Younes El Saleh) saw
"if they were the actual police," and El Saleh responded that he
"saw someone going in . . . [but] did not see the word police nor
a policeman at all."  HASSAN ALI HAMDAN responded, "it is
definitely a company then . . . that came to pick up their
things" and advised El Saleh "to find another place
temporarily[.]"  Based on my training, experience and knowledge
of this investigation, I believe that, in this conversation,
Younes El Saleh and HASSAN ALI HAMDAN discussed their belief that
clothing industry representatives ("the company") were
responsible for the raid on El Saleh's warehouse ("it is
definitely a company then . . . that came to pick up their
things").  I further believe that HASSAN ALI HAMDAN advised El
Saleh to find another location in which to store his counterfeit
goods ("find another place temporarily").

51.   HASSAN ALI HAMDAN was identified as the speaker in these conversations because the subscriber records for the above-noted telephone number list HASSAN ALI HAMDAN's home address as the address of record.  The telephone subscriber address also matches the address listed for HASSAN ALI HAMDAN with the Department of Motor Vehicles.  Furthermore, HASSAN ALI HAMDAN listed the above-noted telephone number as his contact number on a recent United States passport application.  Finally, agents conducted surveillance on HASSAN ALI HAMDAN, in conjunction with the wiretap conversations, and he acted consistently with the individual who was overheard on the wiretap.  Thus, based on my training, experience and knowledge of this investigation, I believe that HASSAN ALI HAMDAN is the speaker in the above-described conversations.

X.   The Identification and Illegal Activity of MAHDI TALEEB

52.   Another of the individuals intercepted over the above-described wiretaps was defendant MAHDI TALEEB.  For example, on or about August 28, 2009, Younes El Saleh used the Younes Telephone to call MAHDI TALEEB.  During that conversation, Younes El Saleh stated, "You have 25 days to pay."  MAHDI TALEEB responded, "Just give me your account number[,] I put cash for you."  Younes El Saleh then stated, "Here's the account number. The name is Zoom Denim and account number 743215790."  Based on my training, experience and knowledge of this investigation, I

believe that in this conversation, Younes El Saleh provided bank account information to MAHDI TALEEB so that TALEEB could deposit proceeds of counterfeit clothing trafficking in order to further their illegal activity.  Specifically, I believe that Younes El Saleh told MAHDI TALEEB that he (TALEEB) should pay within 25 days for counterfeit clothing El Saleh had provided ("You have 25 days to pay") and TALEEB responded that he would deposit cash into El Saleh's bank account ("Just give me your account number[,] I put cash for you").  I further believe that Younes El Saleh then provided to MAHDI TALEEB the bank account controlled by co-conspirator Henri Al Halabi, which bank account was discussed above and seized incident to Al Halabi's arrest ("The name is Zoom Denim and account number 743215790").  My beliefs regarding this conversation are corroborated by other conversations discussed herein.

53.  On or about September 15, 2009, MAHDI TALEEB called Younes El Saleh on the Younes Telephone.  During that conversation, Younes El Saleh stated that he received "4000," to which MAHDI TALEEB responded, "You will receive 5 in the morning."  Younes El Saleh then asked, "5 like this or like those?"  MAHDI TALEEB stated, "5 without checks."  Younes El Saleh then asked, "Is it Abu Ali the name[?]"  MAHDI TALEEB responded, "It is Abu George, his name is Salah Eze-Ideen."  Younes El Saleh then asked, "Who is Salah Eze-Ideen?"  Later in

the conversation, MAHDI TALEEB stated, "The whole three months of summer, there was no business" and added, "The Black Label and Coogi" he received from Younes El Saleh "are still there."  Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, Younes El Saleh and MAHDI TALEEB discussed in code the method that MAHDI TALEEB used to pay for counterfeit clothing obtained from Younes El Saleh. Specifically, I believe that Younes El Saleh stated that he received $4,000 ("4000") and MAHDI TALEEB responded that another $5,000 would be received by the next morning ("You will receive 5 in the morning").  I further believe that Younes El Saleh then asked in coded language about the form of the payment ("5 like this or like those") and MADHI TALEEB explained that the payment would come in money orders ("5 without checks") in the name of a third party ("It is Abu George, his name is Salah Eze-Ideen") that Younes El Saleh did not know ("Who is Salah Eze-Ideen"), a method used to conceal the source of the illegal proceeds.  I believe that later in the conversation, MAHDI TALEEB lamented that sales of counterfeit clothing were slow ("The whole three months of summer, there was no business") and, for that reason, he (TALEEB) still possessed counterfeit clothing Younes El Saleh had supplied previously ("The Black Label and Coogi . . . are still there").

54.  On or about October 8, 2009, Younes El Saleh used the Younes Telephone to call MAHDI TALEEB.  During that conversation, MAHDI TALEEB stated that he "deposited money today but the rest are in money order[.]"  TALEEB added that he "will deposit them tomorrow morning . . . tomorrow morning let him check the account . . . call him and ask him to check the account, they will be in his account."  Younes El Saleh responded, "He called me some time ago and asked, 'Where is your friend?  He did not deposit anything?'"  MAHDI TALEEB then stated, "Tell him ten in the morning to check it out, you tell him that[.]  Anyway, is he the same one we use[d] to speak with?"  Younes El Saleh responded, "Yes, he is the Jewish[,]" adding "I didn't look, so he said he didn't deposit anything, and I told him let me call him."  Based on my training, experience and knowledge of this investigation, I believe that, in this conversation, "him" and "the Jewish" refer to money laundering co-conspirator Henri Al Halabi and that MAHDI TALEEB and Younes El Saleh discussed depositing proceeds of illegal counterfeit clothing trafficking into the Zoom Denim bank account controlled by Al Halabi.  Specifically, I believe that MAHDI TALEEB stated that he deposited cash on one day and that he would deposit money orders the next morning ("deposited money today but the rest are in money order" and "will deposit them tomorrow morning") in an effort to structure the deposits and conceal the illegal

proceeds. I further believe that MAHDI TALEEB stated that Henri Al Halabi should check the bank account the following morning for the full amount of the illegal proceeds ("tomorrow morning let him check the account . . . call him and ask him to check the account, they will be in his account" and "Tell him ten in the morning to check it out, you tell him that"). Based on my training, experience and knowledge of this investigation, I believe that Younes El Saleh stated that he had spoken with Henri Al Halabi, who stated that MAHDI TALEEB had not deposited the money ("He called me some time ago and asked, 'Where is your friend? He did not deposit anything?" and "he said he didn't deposit anything"), which in turn prompted Younes El Saleh to call MAHDI TALEEB ("I told him let me call him").

55. MAHDI TALEEB was identified as the speaker in these conversations through various means. First, he is listed as the subscriber of record for the telephone number noted above. Second, public records list MAHDI TALEEB as previously residing at the address provided in the subscriber records for the above-noted telephone number. Finally, on or about March 2, 2010, an agent who had prior interactions with TALEEB contacted him at the above-noted number, and TALEEB answered the telephone and identified himself. Thus, based on my training, experience and knowledge of this investigation, I believe that MAHDI TALEEB is the speaker in the above-described conversations.

51

WHEREFORE, your deponent respectfully requests that the defendants WADIE JAAFAR, HUSSEN ALI CHAHINE, also known as "Hussein," ▓▓▓▓▓▓▓▓▓▓▓, YOUSSEF AYOUB, HAIDAR AYOUB, AYMAN JAAFAR, also known as "Mohammad" and "Abu Jameel," HASSAN ALI HAMDAN, ALI ATA SALEH and MAHDI TALEEB be dealt with according to law.

_____
JOSEPH HRONCICH
Special Agent
Drug Enforcement Administration

Sworn to before me this
30 Day of March, 2010

_____
THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK